**UNDERWOOD, et v ISHAM, et**

Ohio Appeals, 9th Dist, Summit Co

No 3112. Decided January 23, 1939

(ROSS, PJ, HAMILTON & MATTHEWS, JJ., of the First Appellate District, sitting by designation.)

Wade DeWoody, Akron and Harold Mull, Akron, for appellees.

Bailey & Bailey, Akron and Schwab & Heiser, Akron, for appellants.

**OPINION**

By MATTHEWS, J.

This is an appeal on questions of law from a judgment rendered by the court of common pleas of Summit county in an action under the Declaratory Judgment Act to have declared whether the provisions of the charter of the City of Akron relating

to civil service were applicable to the bailiffs, deputy bailiffs, deputy clerks, cashiers, and stenographers of the Clerk's Office of the Municipal Court of Akron. The court held the provisions were applicable.

At the November election of 1938, the electors of the City of Akron adopted an amendment to the city charter providing rules for the employment, tenure and discharge of the officers and employees of the city, in other words, a civil service plan. While the amendment provides a complete detailed plan, the only part necessary to quote here is the following:

"SECTION 105—CLASSIFICATION.

"The civil service of the city is hereby divided into the unclassified and classified service:

(1) The unclassified service shall include:

"(a) All officers elected by the people.

(b) The directors of the departments of public service, finance and law.

(c) The members of all appointed boards or commissions and advisory boards.

(d) The secretary to the Mayor.

"(2) The classified service shall comprise all positions not specifically included by this charter in the unclassified service."

The Municipal Court of Akron was established in 1920 by an act of the legisla-(§1579-497, GC, et seq.) and as a part of the act creating it provision was made for the appointment of a chief bailiff and deputy bailiffs by the judges of the court, and for a clerk to be elected by the electors of the city with power to appoint deputy clerks, cashiers, and stenographers. On the subject of the appointment, tenure and salaries of these officials, the Act §1579-542, GC, provided:

"The chief deputy clerk, cashiers, deputy clerks, stenographers, the bailiff, the bailiff's clerk and all deputy bailiffs shall hold their office during the pleasure of the appointing power. Whenever a deputy clerk or a deputy bailiff shall be temporarily absent or incapacitated from acting, the judges may appoint a substitute, who shall have the qualifications required of the incumbent of the office. Such appointee shall serve until the return of the regular incumbent or until his incapacity ceases. Such substitute shall be paid for the time he shall serve in the same manner and at the same rate as the officer so temporarily absent or incapacitated, and the amount so paid shall be deducted from the salary of the officer so temporarily absent or incapacitated."

This legislative enactment was in full force and effect at the time of the adoption of the amendment to the city charter and still is.

Under Constitutional mandate (§10, Art. XV) the legislature has enacted a civil service law exempting certain positions from competitive examination, among others, bailiffs, constables, and official court stenographers. (§486-8, GC). This general law was in force in 1920, and placed all positions in controversy here in the unclassified service except deputy clerks and cashiers, and possibly stenographers, dependent upon whether the latter are court stenographers. Of course, the legislature had the power to broaden this unclassified service list within constitutional limitations.

The common pleas court held these positions—deputy clerks, cashiers, stenographers, bailiffs, and deputy bailiffs—were subject to the civil service provisions of the city charter, and fell within the classified service provided for thereby. It is that decision that is under review on this appeal.

The claims of the relator are:—(1) that the chief bailiff, deputy bailiffs, chief clerk, deputy clerks, cashiers, and stenographers are employees of the City of Akron; and (2) that as they do not come within the exempted or unclassifield list provided by the city charter, they are embraced within the general class, which is the classified service list; and (3) that this provision of the city charter takes precedence over any contrary provision by the legislature. These claims are all contested by the defendants.

The people of Ohio, exercising their supreme sovereignty, re-affirmed in terms their sovereignty by expressly declaring in the state consitution that "All political power is inherent in the people." Section 2, Art I, Ohio Constitution. Every governmental agency, claiming political power must trace its right to that source, and exercise such power as the representative of the people and within the limitation imposed by the donor of the power. Neither the legislature nor a municipality has any inherent political power. Whatever of such power either possesses is a delegated power and the Constitution is the instrument by which that power is conferred. We must look to the Constitution as the power of attorney which sets forth the agencies and their authority to act for their principal—the people; and, it might be interpolated here, that the people have not conferred upon any one agency nor upon all combined the whole of the sovereign power possessed by them.

Looking to the Constitution we find that it provides for the division of sovereign power into three branches—the legislative, the executive, and the judicial,—and provides separate agencies for the exercise of each power. By §1 of Art. II, it is provided that "The legislative power shall be vested in a general assembly." No power to legislate for the state as a whole is conferred upon any other agency. And the people imposed a limitation upon the manner of exercising this power by providing that "All laws of a general nature, shall have a uniform operation throughout the state."

And by Art. IV, the judicial power of the state was vested in a supreme court, courts of appeal, courts of common pleas, courts of probate "and such other courts inferior to the courts of appeal as may from time to time be established by law." This special power was not limited by the provision requiring uniform operation throughout the state. **State, ex rel v Yeatman, 89 Oh St, 44,** at 96.

By **Art XVIII of the Constitution** provision is made for the creation of municipal corporations. By section 1, they are classified as cities or villages, depending upon whether the population was more or less than 5000. By section 2, it was made the duty of the legislature to pass general laws for the incorporation and government of cities and villages; and permission or authority was given to enact laws in addition to these general laws for the government of municipal corporations, but these additional laws could not become operative in any municipality unless and until adopted by the electors of such municipality. We assume that these laws "in addition to these general laws", would be special laws not having a uniform operation throughout the state.

Municipal corporations existed at the time of the ratification of Art. XVIII, and under the terms of the schedule ratified at the same election, these corporations continued with all the powers then possessed not inconsistent with the Constitution as amended.

Upon these municipal corporations, then existing or subsequently created in accordance with and under the authority of general laws, certain power was conferred by the Constitution. This grant of power is found in §3 of Art. XVIII and is in this language:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their lim-

its such local police, sanitary and other similar regulations, as are not in conflict with general laws."

The only other provision of the Constitution which it is necessary to consider in the decision of this case is §7 of Art. XVIII, known as the "Home Rule" section. We quote it:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

It will be observed that all this section purports to do is to confer upon communities the power to determine for themselves the form of their local government and the agencies through which to exercise the power of local government, conferred by section 3 of Art. XVIII, upon all municipal corporations. It conferred no additional power of local self-government. **Perrysburg v Ridgway, 108 Oh St, 245.**

The exercise of these constitutional powers by the two governmental agencies—the legislature and the municipal corporations —has given rise to many occasions for the Supreme Court to construe these provisions. The conclusion early reached and never departed from was that no act of substantive legislation by a municipality, as distinguished from the creation of an instrumentality to exercise local power, could stand when in conflict with general laws passed by the legislature, all of which are required by the Constitution itself to have a uniform operation throughout the state, which, of course, includes incorporated as well as unincorporated portions of it; and, further, that municipal ordinances cannot stand when inconsistent with special laws passed by the legislature in the exercise of Constitutional power, as in the creation of courts inferior to courts of appeal.

And even the power given to a community by the "Home Rule" amendment, to provide its own framework for local government, surely is not without its limitations. Conceivably a municipal charter could be framed so as to confer power upon local officers so arbitrary as to violate the fundamental principles of our government, as declared in both the state and federal constitutions.

The principle of these cases is re-affirmed in unambiguous language in **Niehaus v State, ex rel, 111 Oh St, 47** at 52, et seq.:

"The status of a municipality in its relation to the sovereign state is not different by reason or because of the adoption of Section 3, Art. XVIII, granting to municipalities authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations as are not in conflict with general laws, than it was prior to the adoption of that provision, or would be in case of its repeal. * * * *

While within its own boundaries, within the limits of the grant, it executes the functions and possesses the attributes of sovereignty. and to that extent as against its citizens and all persons within its jurisdiction has the rights and immunities of the sovereign, yet as against the sovereign it is but an agent whose powers may be withdrawn at the will of the sovereign that granted them. Hence, the power to exercise sovereignty in local self-government, and local police power not in conflict with general law, does not confer upon municipalities the power to enact and enforce. legislation which will obstruct or hamper the sovereign in the exercise of a sovereignty not granted away."

This was said in a case involving a conflict between a city ordinance and an act of the legislature passed in pursuance of the Constitutional mandate to the legislature to "pass suitable laws * * * to encourage schools and the means of instruction."

If a conflicting municipal ordinance or charter provision cannot stand as against an act of the legislature acting under its special power to pass laws relating to schools, it would seem clear that a conflict between an ordinance or charter provision and an act of the legislature passed under its special power to create courts inferior to courts of appeal, would necessarily result in the fall of the former. That the special power to cre-

**Headnote 3.** ate such courts was conferred upon the legislature by **Section 1 of Art. IV of the Constitution,** and that this power was exclusive was decided in State, ex rel v Hutsinfiller, 112 Oh St, 468.

And, of course, the power to create such courts embraces the power to define their jurisdiction and provide the officials necessary or appropriate to the effective exercise of such jurisdiction. State, ex rel v Davis, 119 Oh St., 596.

The principal, if not the only change made by the "Home Rule" amendment to the constitution was in the method of determining whether a municipality possessed a given power. Prior to the amendment the problem was solved by searching for a legislative enabling act. After the amendment the search was for a legislative act pre-empting the field to the exclusion of municipal action. If the legislature in the exercise of its constitutional power to enact general or special laws has legislated, the municipality cannot nulliy such legislation.

In 8 O. Jur., 353, its is said:

"The police power of a muncipality then, is expressly limited to the enactment of such legislation as is not in contravention of general laws."

Many cases are cited which support the text.

If our deduction from the cases is correct, the problem presented by the case before us is to determine whether the legislature has shown an intent to pre-empt the field to the exclusion of municipal action on the subject.

Assuming that the city charter should be construed as including the positions in question in this case, a conflict is apparent at once. The tenure cannot be at the pleasure of the appointing power and at the same time subject to the protection of civil service preventing removal except for cause, to be determined finally, not by the appointing authority, but by the civil service commission. The legislative intent is so clear that no conclusion can be drawn other than that the civil service provisions of the city charter not only violated the spirit of the law, but also contradict its words.

Notice should be taken of some of the cases cited by counsel. In Leis v Cleveland Railway Co., 101 Oh St, 162, State v O'Mara, 105 Oh St, 94, Heppel v Columbus, 106, Oh St, 107, the municipal ordinances were sustained because they were not in conflict with any act of the legislature. In Perrysburg v Ridgway, 108 Oh St, 245, the majority of the judges found no conflict, whereas, the minority were of the opinion that a conflict existed. In Nelsonville v Ramsey, 113 Oh St, 217, the court was divided again, but in this case the majority found a conflict to exist and held the ordinance was for that reason beyond the power of the municipality. This is shown by the court's comment on Perrysburg v Ridgway, supra, at 227:

"We are cited to the case of **Village of Perrysburg v Ridgway, taxpayer, 108 Oh St, 245.** 140 N. E. 595. We do not regard this case as controlling, for the reason that the same was decided before §614-86, GC, came into effect, and it is further to be noted that on page 259, 140 N. E. 599, in the majority opinion, it is said: 'We are not passing upon the question whether or not a municipality saw fit to interfere with through traffic over its streets by entirely prohibiting the same. That question is not here.' "

**Ellis v Urner, 125 Oh St, 246,** did not involve a conflict between an act of the legislature and a municipal ordinance or charter. There was no municipal action on the subject. The case does sustain the power of the legislature to create the offices of clerks and bailiffs as administrative officers of a municipal court and to exempt them from the operation of the civil service laws.

**State, ex rel v Bernon, 127 Oh St, 204,** involved the question of whether a municipality could provide that candidates for municipal judges should be nominated only by petition, signed not longer than 60 days and filed with the board of elections not less than 40 days prior to the election, and the court held that such a provision was within the power of the municipality and controlled, notwithstanding a provision in the general election laws prescribing a different time for signing and filing. It should be observed that the subject-matter related to the form of municipal government and the manner of exercising power conferred by the legislature, and not an exercise of the substantive power itself. It should also be observed that the same question was presented in this case as in the others of whether the legislature had shown an intent to legislate for the entire state in this respect.

The case of **State, ex rel v Culbertson, 30 O. C. A. 117,** involved a conflict between a legislative act and a municipal ordinance. The ordinance provided for the appointment of the clerk of a municipal court by the judge thereof. The legislative act creating the court contained no provision for a clerk. Under such circumstances, the municipality clearly had power. What the court said about charter provisions prevailing over state laws should be read in the light of the subject-matter.

Summarizing our conclusions, we hold:

(1) That a valid legislative enactment prevails over any and all conflicting municipal action.

(2) That such legislative action may be either such as is required by the constitution to have a general operation throughout the state or special legislation, such as the creation of a court not so required.

(3) That §§1579-497, et seq, GC, creating the Municipal Court of Akron, is a valid law authorized by Sections 1 and 10 of Art. IV of the Constitution of Ohio.

(4) That by the provisions of §1579-542, GC, the tenure of office of the bailiff, deputy bailiffs, deputy clerks, cashiers, and stenographers of said court is at the pleasure of the appointing power.

(5) That the civil service provisions of the city charter if construed as intended to apply to such positions are inoperative because in conflict with the statute.

(6) That as to the bailiffs, deputy bailiffs and official court stenographers the civil service provisions are also in conflict with §486-8, GC.

For these reasons, the judgment of the court of common pleas is reversed, and judgment rendered by this court, declaring that the positions of bailiffs, deputy bailiffs, deputy clerks, cashiers, and stenographers are not subject to the civil service provisions of the charter of the City of Akron.

ROSS, PJ, and HAMILTON, J, concur.